IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN G. SHERRIFF,                          )
                                           )
                    Plaintiff,             )
                                           )
          v.                               )     CIVIL ACTION NO. 07-0966
                                           )
MICHAEL J. ASTRUE,                         )
COMMISSIONER OF SOCIAL SECURITY            )
                                           )
                    Defendant.             )

<u>MEMORANDUM OPINION</u>

CONTI, District Judge

***Introduction***

　　Pending before the court is an appeal from the final decision of the Commissioner of

Social Security ("Commissioner" or "defendant") denying the claim of John G. Sherriff

("plaintiff") for disability insurance benefits ("DIB") under Title II of the Social Security Act

("SSA"), 42 U.S.C. §§ 423, *et seq*., and supplemental social security income ("SSI") under Title

XVI of the SSA, 42 U.S.C. §§ 1381, *et seq*.  Plaintiff contends that the decision of the

administrative law judge ("ALJ") that he is not disabled, and therefore not entitled to benefits,

should be reversed because the decision is not supported by substantial evidence, and that the

case should be remanded for reconsideration of the evidence in order to determine that an award

of benefits is proper.  Defendant asserts that the decision of the ALJ is supported by substantial

evidence, and the prior ruling by the ALJ should be upheld.  The parties filed cross-motions for

summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  By reason

of the ALJ's decision being supported by substantial evidence, defendant's motion for summary judgment shall be granted, and plaintiff's motion shall be denied.

### *Procedural History*

On March 29, 2005, plaintiff protectively filed a Title II application for a period of disability and DIB, along with a Title XVI application for SSI. (R. at 15, 238-40). In both applications, plaintiff alleged the onset of disability to be October 10, 2003, and that the claim for disability was due to degenerative joint disease of the left shoulder, arthritic gout and degenerative disc disease of the lumbar spine. (R. at 15, 17). On October 12, 2005, plaintiff's applications were denied at the initial level. (R. at 77-80). A request for review of the hearing decision order was filed on October 28, 2005. (R. at 11, 15, 83-84).

A hearing was held on July 25, 2006 before the ALJ. (R. at 25-74). Plaintiff appeared and testified. (R. at 31-61). A vocational expert (the "VE") also testified before the ALJ. (R. at 61-74). Plaintiff was represented by an attorney at the hearing. (R. at 31).

In a decision dated October 22, 2006, the ALJ determined that plaintiff was not disabled and, therefore, not entitled to benefits. (R. at 15-23). On December 19, 2006, plaintiff requested a review of that determination. (R. at 252-55). Plaintiff sent a supplemental letter to the Appeals Council on May 24, 2007. (R. at 252). In a responsive letter dated June 22, 2007, the Appeals Council denied the request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 5-8). Plaintiff timely filed the present action on July 12, 2007, seeking judicial review of the ALJ's decision.

### *Plaintiff's Background and Medical Evidence*

Plaintiff was born on October 19, 1957, and was forty-eight years old at the time of the administrative hearing. (R. at 33, 89). He is a high school graduate, and has vocational training

in aircraft maintenance.  (R. at 33).  Plaintiff has past relevant work as a construction laborer, an

assembler, cemetery worker, service training aircraft mechanic, material handler, mechanic,

glass cleaner, and cabinet maker. (R. at 21).  Plaintiff is divorced and lives alone.  (R.at 33-34).

While testifying at the hearing, plaintiff admitted that he had not attempted to look  for work

since the alleged onset of disability in 2003. (R. at 37).  He stated that it was difficult to maintain

employment as a result of his continuing pain because he "kept missing days...because [he]

couldn't make it to work... and [he'd] lose [his] job." (R. at 37, 60).  Plaintiff also indicated that

he received some form of unemployment benefits from the state as a result of the shoulder injury

he suffered, and those payments ceased in or around June 2004.  (R. at 35-37).

Plaintiff testified that his primary care physician is Dr. Sivarama Guntur ("Guntur"),

whom he sees approximately every three months, or on an as-necessary basis, for treatment for

his arthritis and his back.  (R. at 38).  Plaintiff indicated that he began going to the Greensburg

Veterans Administration Hospital (the "VA") in April 2006, and planned to continue to seek

treatment from the VA, but indicated that if he was in immediate need of treatment he would

have to see Guntur because Guntur's office is closer to plaintiff's residence. (R. at 38).

At the time of the hearing, plaintiff testified that he was currently taking prednisone[1] and

oxycodone[2], both of which had been prescribed by Guntur.  (R. at 41).  The prednisone was first

---

[1]     Described as having the same effects as cortisone, prednisone is a steroid drug
used for the reduction of inflammation and to alleviate the symptoms of, *inter alia*, arthritis.
http://www.medicinenet.com/prednisone/article.htm.  Side effects include "retention of
sodium(salt) fluid, weight gain, high blood pressure, loss of potassium, headache and muscle
weakness." *Id.*

[2]     Oxycodone is used to for the treatment of moderate to severe pain, and is
comparable to morphine.  http://www.drugs.com/oxycodone.html.  General side effects include
nausea, vomiting, constipation, loss of appetite, dizziness, headache, tired feeling, dry mouth,
sweating or itching.  *Id.*  More serious side effects include severe weakness or dizziness, or

prescribed in 2004, and plaintiff was directed to take 10mg daily. (R. at 139.). The oxycodone

was initially prescribed on or about December 12, 2005, with the direction to take 325mg daily.

(*Id.).* Additionally, plaintiff testified that the VA had renewed prescriptions for indomethacin[3]

and Allopurinol,[4] and that the indomethacin makes him feel "woozy" or "dizzy... for a couple of

hours." (R. at 40-41). The indomethacin was originally prescribed to plaintiff in 1995, with

plaintiff directed to take 100mg daily. (*Id.*) The Allopurinol was originally prescribed to

plaintiff in 2000, with the direction that plaintiff take 300 mg daily. (*Id.*).

Guntur prescribed a cane to plaintiff. Plaintiff was without his cane on the day of the

hearing, had previously lost one cane on a public bus, and admitted that he did not like to use his

cane in public because it embarrassed him. (R. at 45-46). Plaintiff's need for the cane arises out

of his swollen knees, and he uses it for standing, sitting or walking, and he switches which hand

holds the cane depending on the amount of pain he is experiencing in his hands on a particular

day. (R. at 46).

Regarding the specific instances of pain, plaintiff testified that he has had gout for

approximately ten to thirteen years, and that it affects his feet, knees, wrists and hands. (R. at

feeling light-headed or fainting. *Id.*

[3]     Plaintiff was prescribed Indocin, the brand name for indomethacin, which is a
non-steroidal, anti-inflammatory drug. Physicians' Desk Reference 2001 (62nd ed. 2008).
Indocin is used "to treat pain and redness, swelling and heat (inflammation) from medical
conditions such as arthritis." *Id.* Dizziness, nausea and stomach pain are possible side effects
of Indocin. *Id.*

[4]     Allopurinol is used for the treatment of the symptoms related to gout.
http://www.drugs.com/pdr/allopurinol.html. "[Allopurinol] will not stop a gout attack that is
already underway. However, when taken over a period of several months, allopurinol will begin
to reduce [a patient's] symptoms." *Id.* Side effects include an acute attack of gout, diarrhea,
nausea or rash. *Id.*

43). He is right-hand dominant, and experiences swelling in that hand occasionally from a previous break, in addition to the gout, and he indicated that on some days he is unable to lift anything with that hand. (R. at 42-43). He testified that the arthritis flare-ups in his knees, numbness in his right leg, and the problems with his wrist arise approximately one to two times per week, causing him severe pain and an inability to do anything. (R. at 43-44). Plaintiff testified that the pain in his right shoulder was the result of a torn rotator cuff that he did not have surgically repaired due to a lack of medical insurance. (R. at 44). Plaintiff's complaints of a torn left rotator cuff were unsubstantiated by an x-ray dated December 8, 2003. (R. at 149). The X-ray was conducted by Frick Hospital, and the hospital records indicated Guntur was the attending physician. (*Id*.). Plaintiff further stated that an MRI ordered by Guntur revealed a herniated disc in his  back, and that results in pain which affects the length of time that plaintiff can sit or lay down, and also affects his ability to walk. (R. at 44). Plaintiff indicated that it is difficult to stand for any length of time beyond approximately fifteen minutes. (R. at 45). Plaintiff stated that he has been hospitalized for his pain, but that he was not aware of any plan by the VA to operate on his shoulder because it was not deemed to be  necessary. (R. at 53).

The initial residual functional capacity ("RFC") assessment was performed on or about October 7, 2005 by the Social Security Administration. (R. at 136-37). At the time the RFC assessment was conducted, Guntur reported that "in between sporadic attacks, the [plaintiff] is completely normal… was hospitalized once [that] year when [the plaintiff] had run out of medication during a flare-up [of gout]." (R. at 136). During plaintiff's hospital stay, he was again prescribed medications to treat his symptoms, specifically Indocin and Allopurinol. (R. at 136). After three days of medication, plaintiff's pain had reduced to the point of being 95%

gone. (R. at 136). "Less than one month after [plaintiff's] discharge, [Guntur] reported that the gout was under control." (R. at 136.) The RFC assessment also revealed that plaintiff has relied on Guntur for nearly all of his medical treatment, despite having VA coverage, and that Guntur indicated that plaintiff should seek further pain treatment from Westmoreland Hospital. (R. at 138).

Plaintiff testified about his day-to-day activities. He indicated that he was able to vacuum his residence, prepare meals, operate his own checking account, pay his own bills, shower and dress himself on a regular basis, and perform other tasks which require fine manual dexterity, but that his ability to do any of those activities was determined by the amount of pain that he felt on a given day, and that if he was unable to shower or dress himself, he did not ask for assistance from the on-site nurses at his residence because it embarrasses him. (R. at 48, 53-54, 56). Plaintiff does not have a driver's license, and therefore does not drive himself to the doctor's office or anywhere else. He requires assistance at times if he goes grocery shopping. (R. at 47, 52). He stated that he does not sleep well on a regular basis because of the pain, and that cold weather generally worsens the pain. (R. at 48-49). Plaintiff testified that he spends approximately five or six hours per day watching television and doing crossword puzzles, takes two half-hour naps, and spends at least three hours per day reading "anything that he can get his hands on." (R. at 54-56).

Between the time of the hearing and the onset of the alleged disability, plaintiff testified that his pain had grown much worse, that he can no longer do "the lifting, the hard work, the construction," and that there are some weeks when he is unable to lift anything - including a fork - from several days to an entire week. (R. at 57-59). Plaintiff testified that the medications prescribed for him by Guntur and the VA do not alleviate the pain. (R. at 61).

On May 3, 2003, plaintiff was hospitalized for acute gout of right wrist and hand. It was determined that plaintiff was out of Indocin, and a new prescription was written by Guntur. (R. at 144). Plaintiff was hospitalized on September 11, 2003, this time for pain in his left shoulder. (R. at 146). The treating physician was Dr. Thomas W. Pifferetti, who indicated that plaintiff was suffering from severe bursitis and should be examined by his employer's physician since the shoulder injury was a work-related injury. (R. at 146-47). Further testing by Dr. Anthony J. Nicolette reflected that there were no abnormalities in plaintiff's shoulder. (R. at 148). An MRI of plaintiff's left shoulder was performed on December 8, 2003 under the supervision of Guntur. (R. at 149). The MRI showed significant AC joint[5] degenerative changes present. (*Id.*).

In December 2003, plaintiff was referred to Phoenix Rehabilitation and Health Services ("Phoenix") for physical therapy as treatment for DJD of his left shoulder. (R. at 154-60). Plaintiff attended two physical therapy sessions before indicating to David Angels, his assigned physical therapist, that he was would no longer be able to continue the sessions because he needed to look for employment. (R. at 154). Plaintiff, however did not seek employment after the alleged date of onset. (R. at 37). Notes from the rehabilitation center indicated that plaintiff's condition had improved after only two sessions, and that numerous phone calls to plaintiff regarding additional sessions went unreturned. (R. at 154).

Plaintiff was hospitalized again on February 15, 2005 at Frick Hospital for acute multiple gouty arthritis. (R. at 163-76). He was discharged on February 18, 2005 and Guntur indicated in the medical record that plaintiff's condition was 95% improved. (R. at 163). The medical

---

[5] The AC joint is the shortened name for the acromioclavicular joint. <u>Taber's Cycolpedic Medical Dictionary</u> 29 (20th ed. 2001). It is the joint at the top of the shoulder.

records from this visit indicate that plaintiff was supposed to be taking Indocin and Allopurinol, but he stated that he was not taking them.

Plaintiff pursued further treatment from the Greensburg VA outpatient clinic on April 12, 2006. (R. at 216-21). On that date, plaintiff advised Dr. Radhika Kondaveeti that he had a history of arthritis, but that the pain is controlled with medications and further advised that on that particular date, he could rate his pain at a level two out of ten. (R. at 218). Testing revealed no apparent distress on that date. (R. at 219).

Following plaintiff's testimony, the VE testified. The VE stated that her vocational summary of plaintiff was that he was a younger individual, with a high school education, training in the Service as an aircraft mechanic, and that his jobs were primarily skilled jobs which required all ranges of physical exertion (light to heavy), of which no skills were transferable. (R. at 62-63). The ALJ posed the following hypothetical scenario to the VE:

> Assume a hypothetical individual with the claimant's education, training, and work experience; that is limited to light work and occasional postural maneuvers such as balancing, stooping, kneeling, crouching, crawling, and climbing, and overhead work; and is limited to occasional overhead reaching with the upper left extremity. Are there jobs in the local and national economy that such an individual could perform?"

(R. at 63). In response, the VE opined that this hypothetical person could work as a security guard, stock clerk/order filler and/or a hotel/motel guest clerk, and gave the number of local and national positions available for each category of work. (R. at 63).

The ALJ limited the hypothetical person to be only able to do sedentary work, and the VE opined that jobs such as insurance claim clerks, dispatchers, and/or payroll or time clerk were all positions that are appropriate for sedentary semiskilled workers. (R. at 63-64). Adding further limitations to the hypothetical, the ALJ asked the VE to determine what kind of jobs

could be performed by a person with all of the above characteristics, but that also required simple, routine, repetitive tasks not performed in a production-based environment, and involving only simple work-related decisions, and, in general, relatively few workplace changes. (*Id.*). The VE opined that the only job available under this extended hypothetical would be surveillance system monitor, and that all other jobs, would require fast-paced production and high quotas. (R. at 64). The VE indicated that the hypothetical person might be able to work as an information clerk, while indicating that her hesitation to make that suggestion resulted from the possibility that particular job might be somewhat high stress. (R. at 64-65).

When asked by the ALJ what would be expected by employers in terms of absences and routine rest break periods, as well as time on task, the VE stated that:

> an employer would expect a person to miss no more than one day every two months, would expect a seven-and-a-half to eight- hour workday; working two hours, and then having a 10 to 15-minute break; working two hours, and having a meal period of 30 to 60 minutes; and working two hours with a 10- to 15-minute break. They would expect a person to stay on task 90 percent of the time, with the exception of the surveillance system monitor, which would be 99 percent of the time.

(R. at 65). The VE opined that exceeding these limits on a customary basis would compromise the jobs in the competitive marketplace. (R. at 66).

Prompted by questions posed by plaintiff's counsel, the VE indicated that all the jobs mentioned with regard to the first hypothetical were semiskilled jobs and would not necessarily require bimanual dexterity. (*Id.*). When questioned regarding whether the use of a cane would impact any of the listed jobs, the VE stated that a cane would impact the job of a stock order filler, but not jobs such as the hotel/motel desk clerk, or any of the sedentary jobs listed. (R. at 67). Even the security guard job would not be impacted, as long as the employee could ambulate

around the building. (*Id.*). With regard to the possibility of changing positions, between sitting and standing, the VE stated that some of the jobs that had been mentioned would allow it, while others would not. (R. at 68).

The VE responded to the questions of plaintiff's counsel that being off task more than 10 percent of the time would negatively impact the job, as would taking breaks which would normally exceed the 10 to 15 minutes typically allotted for breaks. (R. at 69-70). Finally, plaintiff's counsel and the VE addressed the issue of lifting requirements for the jobs suggested. (R. at 70-72). The VE stated that the stock order filler might require lifting and reaching overhead, that lifting in a light job would mean lifting up to twenty pounds occasionally and ten or less pounds frequently, occasionally being one-third of the workday, and for a sedentary job the lifting requirement would be up to ten pounds of force occasionally, and negligible amount of force one-third of the workday. (R. at 70-72).

At the end of the hearing, plaintiff's counsel argued that plaintiff met listing requirement 1.04 for the herniated disc in his lower back, under spinal disorders, relying on the last MRI from Frick Hospital to support his argument. (R. at 73-74).

The ALJ issued her decision on October 23, 2006, concluding that plaintiff was not disabled, after evaluating the evidence within the five-step process established by the Social Security Administration. (R. at 15-23).

### *Legal Standard*

Judicial review of the Commissioner's denial of a claimant's benefits is proper

pursuant to 42 U.S.C. § 405(g). This court must determine whether there is substantial evidence

which supports the findings of the Commissioner. 42 U.S.C. § 405(g). Substantial evidence

"does not mean a large or considerable amount of evidence, but rather such evidence as a

reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487

U.S. 552, 564-65 (1988); *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 549 (3d Cir. 2003). This

differential has been referred to as "less than a preponderance of the evidence but more than a

mere scintilla." *Burns v. Burnhart*, 312 F.3d 113, 118 (3d Cir. 2002). This standard, however,

does not permit the court to substitute its own conclusions for that of the fact-finder. *Id.*

*Fargnoli v. Massonari*, 247 F.3d 34, 38 (3d Cir. 2001)(reviewing whether the administrative law

judge's findings "are supported by substantial evidence" regardless of whether the court would

have decided differently the factual inquiry).

### *Discussion*

Under Title XVI of the SSA, a disability is defined as the inability "to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months." 42 U.S.C. §1382c(a)(3)(A).

Similarly, a person is unable to engage in substantial gainful activity when "his physical or

mental impairment or impairments are of such severity that he is not only unable to do his

previous work, but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. §1382c(a)(3)(B).

In order to make a disability determination under the SSA, a five-step sequential evaluation must be applied. 20 C.F.R. §§ 404.1520, 416.920. The evaluation consists of the following stages: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpt. P, Appendix 1; (4) if not, whether the claimant's impairment prevents him from performing his past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of his age, education, work experience and residual functional capacity. 20 C.F.R. §§ 404.1520, 416.920; *Sykes v. Apfel,* 228 F.3d 259, 262-63 (3d Cir. 2000). If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the administrative law judge may find that the plaintiff is not disabled. *Burns v. Burnhart,* 312 F.3d at 119. The Commissioner is charged with the burden of proof with respect to the fifth step in the evaluation process. *Id.*

In the instant case, the ALJ found: (1) plaintiff has not engaged in substantial gainful activity since the alleged onset of disability on October 10, 2003; (2) plaintiff suffers from the combination of the following severe impairments: degenerative joint disease of the left shoulder, arthritic gout and degenerative disc disease of the lumbar spine; (3) these impairments do not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpt. P, Appendix 1; (4) plaintiff is unable to perform any past relevant work; and (5) there are jobs in the national economy that plaintiff could perform. (R. at 17-22).

Plaintiff raises four arguments with respect to the decision of the ALJ: first, that the ALJ erred in her determination that plaintiff's statements concerning the frequency, duration, intensity, persistence, and limiting effects of his symptoms were not entirely credible; second, that the ALJ failed to provide contradictory evidence to invalidate the opinions of plaintiff's treating medical source in derogation of Social Security Ruling 96-2p, Social Security Ruling 96-5p, Social Security Ruling 06-03p and 20 C.F.R. §416.927(d)2; third, that based in part on her adverse credibility determination, and her improper rejection or evaluation of probative medical evidence, the ALJ erred in her conclusion that plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments within 20 C.F.R. part 404, subpt. P. appendix 1; and fourth, that the ALJ erred in the characterization of plaintiff's RFC. Each of these arguments will be addressed.

### A. The ALJ did not err in her determination that plaintiff's statements concerning the frequency, duration, intensity, persistence, and limiting effects of his symptoms were not entirely credible, as there is ample evidence within the record to support that finding.

Subjective complaints of pain are analyzed through a two-step process. 20 C.F.R. §§ 404.1529, 416.929. First, it must be determined whether plaintiff has a medically determinable impairment that could "reasonably be expected" to produce the alleged pain. 20 C.F.R. §§ 404.1529(b), 416.929(b). Next, it must be determined whether the plaintiff's statements about his symptoms are credible in light of the entire record. 20 C.F.R. §§ 404.1529(c), 416.929(c).

After considering the information contained within the record, it was the determination of the ALJ that, despite plaintiff's medically determinable impairments being reasonably "expected to produce the alleged symptoms," the statements made by plaintiff with regard to

13

the frequency, duration, intensity, persistence and limiting effects of these symptoms were not entirely credible. (R. at 19-20). Under the regulations, it is the task of the administrative law judge to determine the extent to which a claimant is accurately stating his or her subjective symptoms or the extent to which he or she is disabled by them. 20 C.F.R. §404.1529(c). In other words, credibility determinations are to be made by the administrative law judge. *Van Horn v. Shweiker*, 717 F.2d 871, 873 (3d Cir. 1983).

After reviewing the evidence contained within the record, the ALJ decided that plaintiff's testimony appeared to be inconsistent with the medical evidence. The ALJ set forth several examples that illustrate these inconsistencies. For example, plaintiff rarely sought medical opinions beyond that of Guntur. The ALJ noted that on or about January 4, 2004, Guntur completed a disability form for state benefits on behalf of plaintiff, in which he indicated that plaintiff was disabled from September 9, 2003 through September 10, 2006. (R. at 19). Evidence within the record of subsequent medical treatments, noted by the ALJ, indicated, however, that plaintiff's condition improved throughout this period of time. (R. at 19).

As previously indicated, plaintiff's complaints of a torn left rotator cuff were unsubstantiated following an x-ray examination. The ALJ noted that the x-ray did show significant AC joint degenerative changes present, but that the condition was not addressed by Guntur at that time or at any time thereafter. Additionally, the ALJ noted that after two sessions of physical therapy, plaintiff had "demonstrated improved range of motion with flexion and abduction ," but that "plaintiff indicated that he was looking for work and [was] unsure if he could continue to attend further physical therapy sessions." (R. at 20). There is nothing contained within the record to indicate that plaintiff returned for subsequent physical therapy. Additionally, the ALJ noted in her opinion that "medical notes dated April 12, 2006 do not

14

report that [plaintiff] had shoulder pain." (R. at 20). Finally, at the hearing, plaintiff testified that he was not currently seeking medical opinions with regard to his shoulder from anyone. (R. at 38).

Plaintiff's record with Phoenix supports the inconsistencies revealed by the ALJ in her decision, especially with respect to plaintiff's ability to take the prescribed medications for his other symptoms. When plaintiff abided by the orders of Guntur, or other physicians that he had seen, his symptoms appeared to be well-controlled and he was able to function normally, without any disruption from pain. References to these statements made by Guntur during the 2005 RFC assessments were included in the decision issued by the ALJ. (R. at 20). Plaintiff asserts that "a medical notation that [plaintiff's] condition is 'stable and well-controlled with medication' does not support a conclusion that the [plaintiff] can work, since the work environment is completely different from a home or clinic." (Pl.'s Br. 13). While it is true that there is a difference between various work environments and a home or clinic, testimony from the VE indicated that there were jobs existing in the national economy that plaintiff could keep despite his conditions, and in light of his typical daily activities.

The RFC assessment conducted in 2005 also reflected that plaintiff relied primarily on Guntur for his medical treatment, despite having VA coverage, and that Guntur had recommended further treatment from additional facilities. Plaintiff has at all times asserted that he lacked the requisite funds to obtain medical treatment from physicians or facilities in addition to Guntur. He claims that the lack of funds is also the primary reason why he did not consistently take the prescribed medications and why he failed to return to physical therapy. Evidence of this assertion is scattered throughout the entire record. The evidence contained within the record supports the ALJ's finding that plaintiff is able to function fully so long as he

15

continues to use the medications prescribed for him by his doctors, but that he often chooses to not take these medications. Along these lines, plaintiff indicated to David Angelo, plaintiff's assigned physical therapist at Phoenix that he could not pursue any further physical therapy because he needed to seek employment. Plaintiff testified, however, that he has not attempted to seek employment since the alleged date of onset. (R. at 37).

When plaintiff went to the VA hospital on April 12, 2006, he was asked to provide a copy of all prior medical records; a request which was met with hesitation by plaintiff. (R. at 216). The ALJ noted in her opinion that upon receipt of those documents, the hospital noticed "a conflict of information reported by the [plaintiff] and information in medical reports from [Guntur]." (R. at 20). On that date, plaintiff reported his pain to be at a level two out of ten, and that he was able to control his symptoms with medication. (R. at 218).

Plaintiff's use of a cane is also an example of inconsistency in his description of his symptoms. In his application for DIB, plaintiff stated that he occasionally used a cane to assist in ambulation, but that the cane had not been prescribed for him by a doctor. (R. at 110). This is in direct conflict with the other evidence of the record, which indicates that Guntur prescribed the cane on February 2, 2005. Plaintiff testified at the hearing that the cane was prescribed for him by Guntur, but he also testified that he was not using a cane on the date of the hearing because he had already lost one while riding the bus, he was not used to using it, and he found it to be humiliating to rely on a cane for ambulation. (R. at 46).

The ALJ determined that plaintiff's statements were not entirely credible. It is plaintiff's contention that the findings by the ALJ were unsupported by the record. A review of the record, however, revealed support for the ALJ's findings. Plaintiff's argument that "[t]he activities [plaintiff] described to his doctors, on disability forms, and at his hearing, were fully

16

consistent with his . . . gouty arthritis, lumbosacral disk disease, and AC joint degenerative changes." (Pl.'s Br. at 10). In part, the ALJ agreed with plaintiff's argument; the ALJ concluded that "[t]he medical evidence establishes medically determinable impairments of gouty arthritis, degenerative joint disease of the left shoulder and degenerative disc disease of the lumbar spine." (R. at 17). In determining credibility the ALJ considered medical records that plaintiff made complaints of symptoms in the past. There is no dispute that the plaintiff's symptoms exist. The inconsistencies to which the ALJ referred recognize that these symptoms may be present. The ALJ, however, noted the obvious discrepancies in plaintiff's condition with regard to treatments and medications administered to plaintiff for each symptom, and how these treatments have been able to alleviate plaintiff's pain when followed or taken as directed. Contrary to plaintiff's argument, the ALJ relied on the record as a whole, and not isolated documents or incidences, in reaching her conclusion. The ALJ's decision is supported by substantial evidence contained within the record.

> **B.**  **The ALJ did not err in the weight given to the opinions of plaintiff's treating medical source.**

Plaintiff argues that the ALJ erred in failing to give controlling weight to the medical determinations of Guntur since Guntur was, at all times relevant to the present claim, plaintiff's primary care physician. When a conflict in evidence exists, an administrative law judge may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala,* 994 F.2d 1058, 1066 (3d Cir. 1993). An administrative law judge must consider all the evidence and give some reason for discounting the evidence she rejects. *Stewart v. Sec'y of Health, Educ., and Welfare,* 714 F.2d 287, 290 (3d Cir. 1983). Here, the

ALJ did not err in disfavoring Guntur's opinion because it conflicted with substantial objective evidence, i.e., the opinions of other examining and treating physicians. 20 C.F.R. §404.1527(d)(2).

Plaintiff fails to realize that the primary care physician is not the only medical source that may be considered by an administrative law judge. The opinions of all treating physicians may be considered when determining whether to give controlling weight to a particular opinion. Additionally, the ALJ is entitled to give substantial weight to the determinations reached by governmental agencies. *Lewis v. Califano,* 616 F.2d 73,76 (3d Cir.1980). Here, the ALJ did not err in considering opinions of the doctors at the VA, whom plaintiff has seen several times.

While it is not disputed that Guntur was, for purposes of this claim, plaintiff's primary care physician, there exists substantial evidence in the record that directly contradicts or conflicts with his opinions. As indicated in the decision of the ALJ, "controlling weight may not be given unless the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. (20 C.F.R. §416.927(d)(2) and Social Security Ruling 96-2p)." (R. at 21). The ALJ determined that the medical evidence, x-ray studies, Guntur's office records, and the "conservative nature of his treatment" of plaintiff's impairments do not support his opinion that the plaintiff is totally disabled. Id. For example, Guntur noted on March 9, 2005, less than one month after plaintiff was hospitalized for a flare-up of gout after running out of medications to treat it, that plaintiff's gout was under control. (R. at 136).

The ALJ did not err in giving substantial weight to the determinations made by the treating physicians at the VA. While these physicians reached the same or similar conclusions as Guntur regarding plaintiff's conditions, all of them determined that plaintiff's conditions were controllable with proper treatment and medications. Despite Guntur being plaintiff's

primary care physician, his determination that plaintiff is disabled and unable to work any job in the national economy conflicts with substantial evidence in the record.

> **C.** **The ALJ did not err in concluding that plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments within 20 C.F.R. Part 404, Subpt. P, Appendix 1.**

Plaintiff argues that the ALJ failed to consider properly the severity of plaintiff's conditions when considering whether those conditions met the requirements for a listed impairment within 20 C.F.R. part 404, subpt. P. appendix 1. If the record, however, supports the ALJ's conclusion that plaintiff does not meet a listing, the ALJ's failure to explain her reasoning is not reversible error. *See Dunahoo v. Apfel,* 241 F.3d 1033, 1037 (8th Cir. 2001).

The record supports the determination of the ALJ. Plaintiff's impairments, whether considered individually or collectively, do not meet the requirements to be considered a listed impairment. Plaintiff did not meet the first prong of the listing requirement of section 1.02, which provides that a plaintiff must experience "major dysfunction of his joints characterized by gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joints." (R. at 18). There is substantial evidence contained within the record which indicates that plaintiff did not meet the remaining requirements for his conditions to be considered a listed impairment, nor did plaintiff's disorder of the spine meet the criteria of section 1.04. Several medical opinions by plaintiff's own primary care physician, contained within the record, indicate that plaintiff's symptoms do not meet the requirements for either listing. While the ALJ was able to ascertain from the medical evidence within the record and from plaintiff's testimony that the alleged conditions do exist,

the evidence of record supports the ALJ's conclusion that plaintiff's conditions are able to be controlled with medication.

**D.     The ALJ did not err in evaluating plaintiff's RFC, and posed a hypothetical question based on the specific capacity/limitations established by the administrative record, and those findings are supported by substantial evidence.**

The ALJ found that:

> "the [plaintiff] has the residual functional capacity to sit six hours a day, stand and walk two hours a day, and lift weights of up to ten pounds frequently. He can perform occasional postural maneuvers, such as balancing, stooping, kneeling, crouching, crawling, and climbing (ramp-stairs/ladders-rope-scaffold) and is further limited to simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving simple, work-related decisions, and in general, relatively few work place changes."

(R. at 18). This determination by the ALJ is supported by substantial evidence of the record. Plaintiff argues that he suffers from severe chronic pain, that he is not functionally capable of performing the standard tasks required of most jobs, such as standing or sitting for prolonged periods of time, that the use of a cane precludes plaintiff from being able to perform most jobs, and that he cannot sustain a routine that requires him to work daily because of the severity and unpredictability of his symptoms. Plaintiff's arguments, however, lack evidentiary support.

Plaintiff fails to acknowledge that his symptoms are controlled with medication, a fact that is substantiated by Guntur and all other treating physicians. The hypothetical posed to the VE took into account the possible scenarios that plaintiff might face in a working environment, beginning with a limitation of light work and occasional postural maneuvers to sedentary work with routine, repetitive tasks. The ALJ even included a limitation that precluded plaintiff from

working in a high stress environment. The testimony of plaintiff and the VE, along with the medical records and documentation submitted by plaintiff support the determination of the ALJ.

Plaintiff contends that there are no jobs existing within the national economy for which he could be eligible. That argument lacks evidentiary support. Testimony by the VE indicated that, even under the limitations posed by the ALJ, there exist thousands of jobs available to plaintiff within the national economy. (R. at 63-65). The ALJ took into account plaintiff's use of a cane, and how that might impact plaintiff's ability to work any of the available jobs mentioned by the VE. As evidenced by the colloquy between the VE and the ALJ at the hearing, the ALJ considered the scenarios that might affect plaintiff's ability to sustain any of the jobs described by the VE.

Finally, plaintiff's argument that the ALJ failed to include undisputed medical evidence of specific impairments contained in the medical record in her hypothetical, and that the failure to do so should reduce the effectiveness of the VE's response, is unsupported. Though the ALJ generalized plaintiff's symptoms in the form of working limitations, all the pertinent symptoms experienced by plaintiff were accounted for, both individually and cumulatively, in the hypothetical.

### Conclusion

Based upon the evidence of record, the parties' arguments and supporting documents filed in support and opposition thereto, this court concludes that substantial evidence supports the ALJ's finding that plaintiff is not disabled. The decision of the ALJ denying plaintiff's application for SSI and DIB is affirmed.

Therefore, plaintiff's motion for summary judgment (Docket No. 6) is **DENIED**, and defendant's motion for summary judgment (Docket No. 8) is **GRANTED**.

By the court:

/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated: May  30, 2008

cc:  Counsel of record